# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
March 23, 2011 Session[1]


## CLARA JEAN WEST, BY AND THROUGH JANET L. HARVEY, CONSERVATOR; AND ESTATE OF ROBERT STOKES WEST, BY AND THROUGH JANET L. HARVEY, ADMINISTRATOR
### V.
## REGIONS BANK


**An Appeal from the Chancery Court for Shelby County**
**No. CH-08-0605-1      Walter L. Evans, Chancellor**

_____

**No. W2010-02023-COA-R3-CV - Filed July 26, 2011**

───────────────────────────

This appeal involves a claim against a bank for conversion. The decedent signed a durable power of attorney appointing his nephew as his attorney-in-fact. Both the decedent and the nephew had accounts at the defendant bank. Using the power of attorney, the nephew endorsed checks made payable to the decedent and deposited them into his own bank accounts at the defendant bank. By the time the decedent died a few months later, the nefarious nephew had almost completely depleted the decedent's estate. The estate of the decedent and the decedent's wife filed this lawsuit against the bank. The trial court granted summary judgment in favor of the bank, based on the statutory immunity granted to banks for recognizing a power of attorney in T.C.A.§ 45-2-707(d). The plaintiff now appeals, arguing that the immunity statute is inapplicable because her claim arose under the UCC, T.C.A. §§ 47-3-307 and 47-3-420. We reverse, finding that T.C.A. § 45-2-707 is inapplicable to the transactions at issue in this appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
is Reversed and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

─────────────────

[1]At oral argument, the parties were asked to submit supplemental briefs to the Court on cases outside Tennessee applying the statutes at issue in this appeal.

John D. Horne, Memphis, Tennessee, for the Plaintiffs/Appellants Clara Jean West, by and through Janet L. Harvey, Conservator; and Estate of Robert Stokes West, by Janet Harvey, Administrator

Randall D. Noel and Melody McAnally, Memphis, Tennessee, for the Defendant/Appellee Regions Bank

## OPINION

### FACTS AND PROCEEDINGS BELOW

### Background

Decedent Robert Stokes West ("Mr. West") was born in Hohenwald, Tennessee, in 1922, and was married to first wife Alta West until her death.[2]  They had no children.  After his discharge from the Army, Mr. West spent his adult working life employed as an engineer for AT&T until his retirement.  Over the course of his employment, Mr. West earned retirement benefits from AT&T, acquired over 7000 shares of AT&T stock, and accumulated savings and other assets.

Mr. West had one brother, James West, Sr.  The brother had three children, one of whom was James West, Jr. ("Nephew").  Mr. West was close to his brother's family, including Nephew; Mr. West and Alta babysat Nephew as a child, and the families took trips to the Memphis Zoo together.  After Nephew was grown, he would try to visit Mr. West and Alta whenever he was in Memphis.

Alta died in 2001.  A few years later, Mr. West married Clara Jean West ("Mrs. West").  Mrs. West had several grown children.  Mr. and Mrs. West lived in Memphis, Shelby County, Tennessee.  Together they had assets valued in excess of $650,000, including bank accounts, annuities, whole life insurance, and the AT&T stock.  After Mr. West married Mrs. West, they sometimes visited Nephew at his home in Cookeville, Tennessee, and in turn Nephew visited them.

By 2007, Mrs. West was 75 years old and Mr. West was 85 years old.  In May of that year, Mrs. West was hospitalized due to severe injuries sustained in a fall.  Around the same time,

---

[2]The facts are taken from the pleadings and from discovery.  As we are reviewing a grant of summary judgment, we view the facts in a light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences.

Mr. West was diagnosed with Alzheimer's disease. In June 2007, Mrs. West was admitted to a nursing home. At that time, due to their advancing age and physical and/or mental infirmities, Mr. and Mrs. West both needed assistance in handling their business affairs.

On June 5, 2007, Mr. and Mrs. West executed a joint durable power of attorney that named Mrs. West's three sons and Nephew as their attorneys-in-fact. Nephew was sent a copy of this first power of attorney at his home in Cookeville.

After receiving the power of attorney, Nephew consulted with a friend he had known since grade school, attorney Joseph A. Livesay ("Mr. Livesay"). Mr. Livesay suggested to Nephew that it would be better for Mr. West to execute his own power of attorney, apart from Mrs. West, and to make the new power of attorney in favor only of Nephew, without Mrs. West's three sons, thereby naming Nephew as Mr. West's sole attorney-in-fact.[3]

Accordingly, Mr. Livesay drafted a second document, entitled "Durable Power of Attorney" (hereinafter called "the POA"), which revoked the prior June 5, 2007 power of attorney executed by Mr. West. The POA named Nephew as Mr. West's sole attorney-in-fact. The POA was a "durable, unlimited, unrestricted, full and absolute power of attorney." It gave Nephew broad, virtually unrestricted authority to act on behalf of Mr. West. Specifically, the POA authorized Nephew to:

> deposit and withdraw funds from any bank account or other account which [Robert West] now [has] or [has] in the future in any bank or other depository, and to sign [Robert West's] name as a drawer of checks and drafts thereon, and to endorse checks, drafts or other instruments belonging to [Robert West] or in which [Robert West has] any right, title or interest for any purpose whatever, whether for deposit or for any other purpose.

The POA gave Nephew the authority "to sell . . . any stocks" owned by Mr. West, and "to handle matters related to any life insurance, including but not limited to the right to make changes to, maintain, or cancel . . . ." The POA also stated that it "was durable and shall not be affected by subsequent disability or incapacity of the principal." On June 26, 2007, Nephew and Mr. Livesay took the POA to Mr. West, and Mr. West signed the document.

---

[3]In his affidavit filed in this case, Mr. Livesay asserted that Nephew was the proper choice as Mr. West's attorney-in-fact because Nephew had already been handling his uncle's affairs. The complaint filed in the trial court, however, avers that Nephew "had little or no previous involvement in the business affairs of Robert West and/or Clara West." Nephew admitted that, prior to having Mr. West execute the second power of attorney discussed herein, he had never handled any financial matters for his uncle.

In short order, Nephew presented the POA to the Memphis branch of the Defendant/Appellee Regions Bank ("the Bank"), where Mr. and Mrs. West maintained their bank accounts and had regularly conducted business. On June 28, 2007, two days after the POA was executed, Nephew presented the POA to the Cookeville branch of the Bank, which was closer to his own home in Gainesboro, Jackson County, Tennessee. Nephew's personal checking account, joint with his wife Starrlene, was at this Regions Bank branch. The POA was placed on file at both the Memphis and Cookeville branches of the Bank.

In accordance with the Bank's policy on powers of attorney, on July 2, 2007, Nephew executed an Affidavit of Continued Validity. The Affidavit stated, among other things, that (1) Nephew is the attorney-in-fact named in Mr. West's POA, and that (2) Mr. West was not incompetent, incapacitated, or disabled at the time he executed the POA. The Affidavit of Continued Validity also included an indemnity provision whereby Nephew agreed to "indemnify and hold harmless Regions Bank from any and all actions, causes of action, claims, demands, damages, costs and expenses, of whatsoever kind, . . . including attorneys' fees and court costs, arising in any manner or from any source whatsoever relating to the use of the Power of Attorney . . . ."

Subsequently, pursuant to the authority granted to him in the POA, Nephew set about transferring most of the assets owned by Mr. West (and some owned jointly with Mrs. West) to himself. This included writing checks directly from Mr. West's bank account and depositing them into Nephew's personal bank accounts. Specifically, over a three-month period in July, August, and September 2007, Nephew wrote nine checks totaling $37,268 payable to "cash" from Mr. and Mrs. West's joint checking account, account ending in 4632.[4] These monies were deposited into Nephew's own bank accounts, one owned jointly with Starrlene, account ending in 6575 ("personal account"), and the other in the name of "James H. West d/b/a My New Credit," account ending in 0355 ("business account"). In September 2007, Nephew wrote a check for $28,000 from Mr. West's account and made it payable to Nephew's company, My New Credit; this check was deposited into Nephew's business account.[5]

_____

[4]Of the nine checks written on Mr. and Mrs. West's joint checking account, eight were counter checks written at the Cookeville branch and one was a pre-printed check.

[5]Nephew's business background was as a motivational speaker for Alpine Industries; his motivational talks were aimed at bringing distributors into Alpine's business. Nephew organized My New Credit as a limited liability company (LLC), purportedly set up to teach clients how to repair and improve their credit rating. Another enterprise was a "multi level marketing" company, in which Nephew recruited others to sell nutritional products such as juice drinks, energy drinks, and weight loss products. Nephew also set up a business called Champions for Life, selling motivational tapes and CDs "to give folks the opportunity . . . to start a home-based business and earn extra income, and to teach people to have a champion mentality."

Nephew also used the POA to liquidate Mr. West's non-cash assets.[6] Once these assets were liquidated, Nephew transferred the proceeds to himself. In September 2007, a Regions Bank officer assisted Nephew in selling Mr. West's long-held AT&T stock. From the sale of the stock, Nephew received a check from AT&T, made payable to Mr. West, for $322,437. On October 9, 2007, Nephew endorsed the AT&T check as "Robert S. West POA," and deposited it into his own "My New Credit" business account.

Also in September 2007, Nephew liquidated an annuity owned by Mr. West through Lincoln National Life Insurance Company. As proceeds from the annuity, Lincoln National Life wrote a check payable to Mr. West in the amount of $31,211. Nephew received the check, endorsed it as "Robert S. West" and "James H. West P.O.A.," and deposited it into his own My New Credit business account.

As Mr. West's health deteriorated, Nephew surrendered a life insurance policy issued to Mr. West by ING Midwestern United Life Insurance Company. Nephew received a check from the company for the life insurance, made payable to Mr. West, in the amount of $13,573. On October 15, 2007, Nephew endorsed the check as "Robert S. West P.O.A." and deposited it into his My New Credit business account.[7]

All told, the assets that were liquidated and transferred from Mr. West to Nephew and deposited into Nephew's Regions Bank accounts totaled approximately $367,221.

Nephew utilized some of the proceeds from Mr. West's assets in unusual ways that involved further participation by Bank officials. On October 9, 2007, Nephew wrote a check in the amount of $400,000 out of his Regions My New Credit business account, made payable to AMERUS Life, to purchase an annuity. On October 15, 2007, the check was returned with an "insufficient funds" notation. After this incident, on October 23, 2007, Nephew told Bank officers with the Regions Bank Cookeville branch that "he wanted to rebuild his credit" by purchasing a $100,000 CD with the Bank, and then borrowing $100,000 from Regions, using the CD as collateral. To accomplish this, Nephew used $100,000 from his My New Credit

---

[6]The Plaintiff claims that, even beyond the money that Nephew took, the liquidation of Mr. West's assets caused tremendous tax consequences to Mr. West, which resulted in tax liabilities that further depleted his remaining resources.

[7]On October 9, 2007, Nephew endorsed a check from AIG Annuity Insurance Company made payable to Mr. West, and he used it to purchase a $150,000 Certificate of Deposit ("CD") from the Community Bank of the Cumberlands in Cookeville. The balance of $16,950 was deposited into a Community Bank of the Cumberlands account owned by Nephew and wife Starrlene. This transfer is not being challenged in this appeal, because it did not involve Regions Bank.

business account, funded by Mr. West's assets, to purchase the $100,000 CD from the Bank. In turn, the Bank loaned Nephew $100,000 secured by the CD.

On October 27, 2007, Mr. West died at the age of 85. He left no will, and his only heir at law was his surviving spouse, Mrs. West. By the time Mr. West died, most of Mr. West's estate had been depleted by Nephew, leaving Mrs. West with significantly less funds for her support and maintenance.[8]

On January 15, 2008, Janet L. Harvey ("Ms. Harvey") was appointed as the conservator of the person and property of Mrs. West by the Shelby County Probate Court. On March 12, 2008, the estate of Mr. West was opened in the Shelby County Probate Court, and Ms. Harvey was appointed by the court as the administrator of his estate.

## Lawsuit

On March 31, 2008, Mrs. West, by and through Ms. Harvey as her conservator, and the Estate of Robert Stokes West, by and through Ms. Harvey as the administrator of the estate ("Plaintiff"),[9] filed a "Complaint to Recover Funds Transferred or Obtained By Undue

---

[8]Of a total of over $650,000 in assets, approximately $176,000 to $180,000 was left. In addition, there were substantial tax obligations stemming from the liquidation of assets such as the AT&T stock. Nephew insisted that he had used his uncle's assets in a way that comported with the uncle's wishes. Nephew testified in his deposition that Mr. West wanted him to do

> two things: One, to be sure that his wife was taken care of; and, two, to be sure that her kids never got their hands on any of his money. Other than that, I'm very confident from the conversations that I had had with my uncle that as long as I was doing those two things, he wasn't going to be concerned with any of the other things. He was pleased I was in business for myself, . . . and I believe he was pleased that he could help in any way that he could.

Nephew was asked:

> Q: So when you say to take care of his wife, did you also convert all the Regions Bank accounts that her name was on?
>
> A: Yes, sir.

Nephew explained: "I was . . . protect[ing] his money from her kids, and I thought the best way to do that was to have everything out of his name."

[9]Although technically Ms. Harvey represents two Plaintiffs, Mrs. West and the estate of Mr. West, she is the
(continued...)

Influence, Misrepresentation, Negligence, Breach of Trust and/or Fraud, As Well As For Punitive Damages and Injunctive Relief."  In the original complaint, the Plaintiff named as defendants Nephew; My New Credit, LLC; Regions Bank; and other entities that were later dismissed from the lawsuit.[10]  On December 16, 2008, the Plaintiff filed an amended complaint, adding Nephew's wife Starrlene as a defendant.[11]

In the original and amended complaints, Plaintiff alleged that Nephew exerted undue influence over Mr. West, breached his fiduciary duty to Mr. West, exploited his confidential relationship with Mr. West, and acted with fraudulent intent.  The Plaintiff contended that Nephew's actions constituted conversion, misappropriation, and fraudulent breach of trust.[12] As against Regions Bank, the appellee herein, the Plaintiff alleged that the Bank was negligent and enabled and/or abetted Nephew in his wrongful actions, including, but not limited to, conversion, misappropriation, and breach of trust.  The Plaintiff claimed that the Bank's agents "were familiar with Robert West and Clara West, and knew or should have known that [Nephew] was wrongfully taking the assets of Robert West and Clara West that had been entrusted to Regions, for his separate ownership and use . . . ."  The complaint alleged that the Bank "knew or should have known that the actions of [Nephew] with regard to the funds of Robert West and Clara West were suspicious and should have required inquiry or investigation, which [the Bank] failed to do."

The Bank filed an answer denying the allegations in the complaint.  The Bank was later granted permission to amend its answer to include a crossclaim against Nephew for

_____

[9](...continued)
only representative involved in the lawsuit.  Therefore, for simplicity, we refer to her in the singular as "the Plaintiff."

[10]The original complaint listed as defendants AIG Annuity Insurance Company, Jefferson Pilot Insurance Company, and Midwestern United Life Insurance Company, a part of the ING Insurance Americas Group.  Those defendants were voluntarily dismissed from the lawsuit by order entered on October 1, 2008.  The original complaint also listed Computershare Trust Company, N.A., and AT&T, Inc., as defendants, but those defendants were voluntarily dismissed by order entered on November 17, 2008.

[11]While the original complaint listed Eaves & Associates as a defendant, the amended complaint listed instead Jeffrey Todd Carneal, the personal representative of Richard L. Eaves, deceased, who was formerly doing business as Eaves & Associates.  Mr. Carneal was voluntarily dismissed from the lawsuit by order dated October 28, 2009.
        The amended complaint also added Community Bank of the Cumberlands as a defendant, but this defendant entered into a settlement and was dismissed from the lawsuit with prejudice on October 4, 2010.

[12]For purposes of this appeal, we assume that Nephew, Mr. West's attorney-in-fact, had a fiduciary duty to Mr. West and that Nephew's conduct constituted a breach of his fiduciary duty.

indemnification pursuant to the indemnity provision in the Affidavit of Continued Validity. Discovery ensued.

On July 2, 2010, the Bank filed a motion for summary judgment.[13] The motion asserted that the Bank was immune from liability because its actions were in recognition of a duly executed POA. The Bank relied on Tennessee Code Annotated § 45-2-707, which provides that banks "may recognize the authority of a power of attorney," and that "[n]o bank shall be liable for damages" for making payments pursuant to the statute. The Bank argued that this statute shielded it from liability, because in all of the transactions at issue, the Bank relied on the authority granted to Nephew in Mr. West's duly executed and notarized POA. In support of its motion, the Bank submitted a copy of the POA, the affidavit of Mr. Livesay, and Nephew's Affidavit of Continued Validity.

In response to the Bank's motion for summary judgment, the Plaintiff argued that the immunity statute upon which the Bank relied was inapplicable to the Plaintiff's claims. The Plaintiff contended that the Bank's liability arose out of Tennessee's Uniform Commercial Code ("UCC"), specifically, Tennessee Code Annotated § 47-3-307 and § 47-3-420. Under these statutes, the Plaintiff argued, a bank may be held liable for accepting checks made payable to a principal that are deposited by a fiduciary into the fiduciary's personal account, without respect to Section 45-2-707(d), the immunity statute. The Plaintiff argued that there were genuine issues of material fact, because material evidence showed that the Bank knew or should have known that Nephew was acting in breach of his fiduciary duty. In support of her response, the Plaintiff filed the depositions of Nephew and two Bank officials.[14]

On September 15, 2010, the trial court entered an order granting the Bank's motion for summary judgment. The trial court first noted the following undisputed facts: the POA was prepared by Mr. Livesay, was duly executed by Mr. West, and granted Nephew the authority to deposit and withdraw funds from Mr. West's bank accounts and to endorse checks on such accounts "for any purpose whatever." The trial court then found that the Bank "relied on the duly executed and notarized Durable Power of Attorney in permitting [Nephew] to withdraw funds from Robert West's accounts at Regions, to sign Robert West's name as a drawer of checks and drafts, and to endorse checks, drafts or other instruments belonging to Robert West." Based on these facts, the trial court found, the Bank "cannot be held liable as a matter of law, pursuant to Tennessee Code Section 45-2-707." Finding no just reason for

_____

[13]Nephew also filed a motion for summary judgment. That motion is not at issue in this appeal.

[14]The Plaintiff filed the depositions of Bobby J. Garrison, Senior Vice President for the Bank and branch manager of its Cookeville branch, and Linda Hibbitt, Senior Regional Operations Officer for the Bank's West Tennessee Operations.

delay, the trial court certified this order as final and appealable pursuant to Rule 54.02 of the Tennessee Rules of Civil Procedure.[15]  From this order, the Plaintiff now appeals.

## ISSUE ON APPEAL AND STANDARD OF REVIEW

On appeal, the Plaintiff argues that the trial court erred in granting summary judgment in favor of the Bank based on Section 45-2-707(d) without recognizing the Bank's potential liability under the UCC.  The decision to grant or deny a motion for summary judgment is a question of law, which we review *de novo* on the record, affording no presumption of correctness to the trial court's decision.  *See Huber v. Yohanek (In re Storey)*, No. W2010-00819-COA-R3-CV, 2011 WL 2174901, at *11-12 (Tenn. Ct. App. May 31, 2011).

A trial court's grant of summary judgment is appropriate only when there is no genuine issue of material fact, and the moving party is entitled to a judgment as a matter of law.  Tenn. R. Civ. P. 56.04; *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 5 (Tenn. 2008); *Byrd v. Hall*, 847 S.W.2d 208, 214 (Tenn. 1993); *see also Estate of French v. Stratford House*, 333 S.W.3d 546, 553-54 (Tenn. 2011).  In *Hannan*, the Tennessee Supreme Court outlined the analysis to be employed by trial courts faced with a motion for summary judgment.  "It is not enough for the moving party to challenge the nonmoving party to 'put up or shut up' or even to cast doubt on a party's ability to prove an element at trial."  *Hannan*, 270 S.W.3d at 8.  Rather, the moving party must "either affirmatively negate an essential element of the non-moving party's claim or conclusively establish an affirmative defense."  *Id.* (quoting *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 88 (Tenn. 2000)).  The party seeking summary judgment has the ultimate burden of persuading the court "that there are no disputed, material facts creating a genuine issue for trial . . . and that he is entitled to judgment as a matter of law."  *Byrd*, 847 S.W.2d at 215.  The court must accept the facts presented by the nonmovant as true, and all doubts regarding the existence of genuine issue of material fact must be resolved in the nonmovant's favor.  *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008).

In the instant case, the trial court granted summary judgment in favor of the Bank based on the immunity statute, Section 45-2-707(d).  Thus, the only issue on appeal is whether the Bank is entitled to immunity under Section 45-2-707(d) for the transactions at issue in this

---

[15]At oral argument, the parties were asked to address whether Rule 54.02 certification was properly granted.  The Plaintiff still has claims pending in the trial court against Nephew, his wife, Starrlene, and My New Credit, LLC.  She asserts that the September 15, 2010 order was properly certified as final, because her claims against Regions Bank are severable from the pending claims, and because the trial court's order adjudicated all of her claims against Regions Bank.  We agree with the Plaintiff and find that Rule 54.02 certification was proper.

appeal. This, too, is purely a question of law, which we review *de novo*. ***See Sanford v. Waugh & Co.***, 328 S.W.3d 836, 843 (Tenn. 2010).

**ANALYSIS**

At the outset, we must clarify the transactions at issue in this appeal. Although Nephew engaged in a wide range of transactions involving Mr. West's assets, the claims that are at issue in this appeal arise out of third-party checks made payable to Mr. West, endorsed by Nephew, and deposited into Nephew's personal or business accounts at the Bank. We presume that this is because the Plaintiff contends that these transactions fall within the ambit of the UCC provisions on which the Plaintiff relies, Sections 47-3-307 and 47-3-420.[16] Thus, although the trial court granted summary judgment to the Bank as to all claims against it, we consider only the Plaintiff's claims regarding the proceeds of three third-party checks made payable to Mr. West: (1) the check from AT&T for $322,437, from the sale of Mr. West's AT&T stock; (2) the check from Lincoln National Life Insurance Company for $31,211, from liquidation of Mr. West's annuity; and (3) the check from ING Midwestern Life Insurance Company for $13,573, from the surrender of Mr. West's life insurance policy.

As to these checks, the Plaintiff argues that Section 45-2-707(d) does not protect the Bank from claims brought pursuant to the UCC, because Section 45-2-707(d) provides immunity only as to "payments made" or "property withdrawn" from Mr. West's Regions Bank account 4632. Specifically, she argues, this statutory immunity does not apply to the transactions at issue, set forth above, in which checks were made payable to Mr. West, were endorsed by

---

[16]We note the provisions of Tennessee's Uniform Fiduciary Act, which generally governs a bank's liability for the actions of a fiduciary depositor, and specifically addresses circumstances in which a fiduciary deposits his principal's funds into the fiduciary's personal account. Tennessee Code Annotated § 35-2-109 provides:

> If a fiduciary makes a deposit in a bank . . . to the fiduciary's personal credit . . . of checks payable to the principal and endorsed by the fiduciary, if the fiduciary is empowered to endorse such checks, . . . the bank . . . receiving such deposit is not bound to inquire whether the fiduciary is committing thereby a breach of the obligation as fiduciary.

T.C.A. § 35-2-109 (2007). The statute goes on to provide that the bank may receive such a deposit without liability to the principal unless the bank receives it "with actual knowledge that the fiduciary is committing a breach of the obligation as fiduciary" or "with knowledge of such facts that its action in receiving the deposit . . . amounts to bad faith." ***Id.***; *see **C-Wood Lumber Co., Inc. v. Wayne County Bank***, 233 S.W.3d 263, 274-75 (Tenn. Ct. App. 2007). In the ***C-Wood Lumber Co.*** decision, however, the Court held that the Uniform Fiduciary Act "cannot be construed harmoniously" with the UCC provisions at issue in this case, and that the UCC in effect repealed these Uniform Fiduciary Act provisions by implication. ***Id.*** at 278. Therefore, we do not apply the Uniform Fiduciary Act in our analysis.

-10-

Nephew POA, and then were deposited directly into Nephew's own personal accounts.[17] Claims regarding those transactions, she argues, are governed by the UCC, specifically Sections 47-3-307 and 47-3-420. Under these UCC provisions, she claims, the Bank may be held liable for conversion, and it is not shielded by the immunity statute. The Plaintiff argues that this Court's decision in *C-Wood Lumber Company v. Wayne County Bank*, 233 S.W.3d 263 (Tenn. Ct. App. 2007), a UCC case, supports her position.

In response, the Bank argues that Section 45-2-707 must be read broadly, providing full immunity to a bank that recognizes a power of attorney in any transaction, even those governed by the UCC. The Bank contends: "Whether [the Plaintiff's] causes of action are for conversion or notice of breach of fiduciary duties, they undisputedly seek to impose liability on Regions for payments made and/or property withdrawn pursuant to the Power of Attorney." It notes that the language in Section 45-2-707 has no limitation or exception for conversion or other claims asserted by the Plaintiff, and it asserts that the Plaintiff's attempt to distinguish claims barred by the statute and those not barred by the statute is a pointless exercise in semantics, because the immunity statute was not abrogated by the enactment of the UCC.[18] The Bank points out that the POA in this case expressly authorized Nephew to "deposit and withdraw funds" from Mr. West's bank accounts, "sign [Mr. West's] name as a drawer of checks and drafts thereon," and "endorse checks, drafts or other instruments belonging to [Mr. West] or in which [Mr. West] ha[s] any right, title or interest for any purpose whatever, whether for deposit or for any other purpose." The Bank insists that the immunity statute allows it to rely on this broad power of attorney without incurring liability.

Thus, presuming that the Bank may otherwise be liable to Plaintiff for conversion under the UCC provisions at issue, the Bank argues, and the trial court found, that Section 45-2-707(d) shields the Bank from such liability. Neither party has cited a case directly on point, from Tennessee or any other jurisdiction, and we have found none. It appears, therefore, that this is an issue of first impression in Tennessee. Consequently, we consider the principles of statutory construction, examine the language of the statutes at issue, and seek guidance from the available caselaw.

Our primary objective when engaging in statutory construction is to carry out the intent of the legislature without unduly broadening or restricting the statutes. ***Arias v. Duro Standard***

---

[17]In her amended complaint, the Plaintiff did not specify the damages she sought from Regions Bank; rather, she requested that the Bank "be disgorged of any profits or security interests attributable to any of the above transactions in which [the Bank] may have been involved."

[18]The Bank notes that the Plaintiff no longer claims that Regions Bank is liable for Nephew's activity related to Mr. West's own bank account 4632.

*Prods. Co.*, 303 S.W.3d 256, 260 (Tenn. 2010). "When statutory language is clear and unambiguous, we must apply its plain meaning in its normal and accepted use, without a forced interpretation that would extend the meaning of the language and, in that instance, we enforce the language without reference to the broader statutory intent, legislative history, or other sources." *Carter v. Bell*, 279 S.W.3d 560, 564 (Tenn. 2010) (citing *Overstreet v. TRW Commercial Steering Div.*, 256 S.W.3d 626, 630 (Tenn. 2008)). If the language in the statute is ambiguous, then we turn to "the entire statutory scheme and elsewhere to ascertain the legislative intent and purpose." *Eastman Chem. Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn. 2004). We presume "that the legislature purposefully chose each word used in a statute and that each word conveys a specific purpose and meaning." *State v. Denton*, 149 S.W.3d 1, 17 (Tenn. 2004).

The subject matter of the statutes at issue in the instant case overlap. "Statutes relating to the same subject or having a common purpose should be construed together," in *pari materia*, in order to advance their common purpose or intent. *Carter*, 279 S.W.3d at 564 (citing *Lawrence County Educ. Ass'n v. Lawrence County Bd. of Educ.*, 244 S.W.3d 302, 309 (Tenn. 2007)); *Frye v. Blue Ridge Neuroscience Ctr., P.C.*, 70 S.W.3d 710, 716 (Tenn. 2002). We avoid an interpretation that "places one statute in conflict with another." *Cronin v. Howe*, 906 S.W.2d 910, 912 (Tenn. 1995). "[T]herefore, we must resolve any possible conflict between statutes in favor of each other, so as to provide a harmonious operation of the laws." *Id.* However, "[w]here a conflict is presented between two statutes, a more specific statutory provision takes precedence over a more general provision." *Graham v. Caples*, 325 S.W.3d 578, 582 (Tenn. 2010) (citing *Arnwine v. Union Cnty. Bd. of Educ.*, 120 S.W.3d 804, 809 (Tenn. 2003)).

We note that Tennessee adopted the UCC after it enacted the immunity statute relied upon by the Bank. In construing statutes, we presume that the legislature was aware of its prior enactments and of decisions of the courts when it enacted new legislation. *Ki v. State*, 78 S.W.3d 876, 879 (Tenn. 2002).

As a starting point, we examine the language in the relevant UCC provisions. Title 47 (Commercial Instruments and Transactions, *i.e.*, the UCC), Chapter 3, Part 3 relates to the enforcement of instruments. This statute addresses when a payor bank is deemed to have notice of a fiduciary's breach of his fiduciary duty:

> (b) *If (i) an instrument is taken from a fiduciary for payment or collection or for value, (ii) the taker has knowledge of the fiduciary status of the fiduciary, and (iii) the represented person makes a claim to the instrument or its proceeds on the basis that the transaction of the fiduciary is a breach of fiduciary duty*, the following rules apply:

(1) Notice of breach of fiduciary duty by the fiduciary is notice of the claim of the represented person.

(2) In the case of an instrument payable to the represented person or the fiduciary as such, *the taker has notice of the breach of fiduciary duty if the instrument is* (i) taken in payment of or as security for a debt known by the taker to be the personal debt of the fiduciary, *(ii) taken in a transaction known by the taker to be for the personal benefit of the fiduciary*, or (iii) deposited to an account other than an account of the fiduciary, as such, or an account of the represented person.

T.C.A. § 47-3-307(b) (2001). This Court has described Section 47-3-307 as "an elaborate statement of the 'red flag' circumstances under which a bank accepting an instrument from a fiduciary will be deemed to be 'on notice' and, therefore, subject to claims of the principal that the fiduciary has misappropriated funds." *C-Wood Lumber Co.*, 233 S.W.3d at 276. The rationale for deeming the bank to be on notice under these circumstances is that "it is not normal for an instrument payable to the represented person or the fiduciary, as such, to be used for the personal benefit of the fiduciary. It is likely that such use reflects an unlawful use of the proceeds of the instrument."[19] *Id.* at 277 n.32 (quoting T.C.A. § 47-3-307 cmt. 3). When a bank is deemed to have had notice of a fiduciary's breach of his duty under Section 47-3-307, it is no longer a holder in due course, and the bank may be held liable to the principal for accepting the check for deposit into the fiduciary's bank account.[20] *See id.* at

[19]Section 47-3-307 does not apply when the endorsement on the instrument is forged or when the instrument is altered. "An endorsement by a fiduciary with the authority to endorse and deposit checks payable to the principal is not a forgery under the UCC." *C-Wood Lumber Co.*, 233 S.W.3d at 277.

[20]The UCC comments to this provision explain:

Under Section [47-]3-306, a person taking an instrument is subject to a claim to the instrument or its proceeds, unless the taker has rights of a holder in due course. Under Section [47-]3-302(a)(2)(v), the taker cannot be a holder in due course if the instrument was taken with notice of a claim under Section [47-]3-306. Section [47-]3-307 applies to cases in which a represented person is asserting a claim because a breach of fiduciary duty resulted in a misapplication of the proceeds of an instrument. The claim of the represented person is a claim described in Section [47-]3-306. Section [47-]3-307 states rules for determining when a person taking an instrument has notice of the claim which will prevent assertion of rights as a holder in due course. It also states rules for determining when a payor bank pays an instrument with notice of breach of fiduciary duty.

(continued...)

276 & n.29. Indeed, one commentator has gone so far as to describe Section 307 of the UCC as imposing "automatic liability if a bank allows a fiduciary to deposit [an instrument payable to the beneficiary] in the fiduciary's personal account and the fiduciary then uses the funds for non-fiduciary purposes." MARION BARFIELD, JR., AND PETER ALCES, *Bank Liability for Fiduciary Fraud*, 42 ALA. L. REV. 475, 520 (Winter 1991).

Part 4 of the same Chapter of Title 47 relates to the Liability of Parties. Section 47-3-420 describes the law of conversion applicable to such "instruments" under the UCC:

> (a) The law applicable to conversion of personal property applies to instruments. An instrument is also converted if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment. An action for conversion of an instrument may not be brought by (i) the issuer or acceptor of the instrument or (ii) a payee or endorsee who did not receive delivery of the instrument either directly or through delivery to an agent or a copayee.
>
> (b) In an action under subsection (a), the measure of liability is presumed to be the amount payable on the instrument, but recovery may not exceed the amount of the plaintiff's interest in the instrument.
>
> (c) A representative, including a depositary bank, who has in good faith dealt with an instrument or its proceeds on behalf of one who was not the person entitled to enforce the instrument is not liable in conversion to that person beyond the amount of any proceeds that it has not paid out.

T.C.A. § 47-3-420 (2001). This Court has recognized that Section 47-3-307 "invites payees of checks embezzled by the payee's fiduciary to sue the depository bank for conversion under Tenn. Code Ann. § 47-3-420." **C-Wood Lumber Co.,** 233 S.W.3d. at 277.

We agree with the Plaintiff that the transactions at issue fall squarely within Sections 47-3-307 and 47-3-420. The Bank knew that Nephew was acting with a power of attorney, and had his POA on file. There is evidence in the record that the Bank knew that the checks made payable to Mr. West were "taken in . . . . transaction[s] known by the [Bank] to be for the

[20](...continued)
T.C.A. § 47-3-307 cmt. 2.

-14-

personal benefit of" Nephew.[21] T.C.A. § 47-3-307(b)(2). If this is proven, under this statute, the Bank would be deemed to have notice of Nephew's breach of his fiduciary duty. This gives rise to an action for conversion under the UCC, pursuant to Section 47-3-420.

This conclusion is supported by the analysis in this Court's opinion in *C-Wood Lumber Co.*, cited by the Plaintiff. In that case, the owner of a corporation sought to give the corporation's secretary/treasurer full authority to manage the bank account of the corporation. To this end, the corporation filed a corporate resolution with the defendant bank that gave the secretary/treasurer the authority to sign and endorse corporate checks, even if such checks were "drawn or endorsed to the order of any officer signing the same, payable to cash or bearer or in payment of the individual obligation of such office, or for deposit to his personal account . . . ." *C-Wood Lumber Co.*, 233 S.W.3d at 269. Even further, the resolution stated that the bank "shall not be required or be under any obligation to inquire as to the circumstances of the issuance or use of any instrument signed in accordance with the foregoing resolution or the application or disposition of such instrument or the proceeds thereof." *Id.* In the ensuing months, the secretary/treasurer embezzled about $500,000 from the corporation by endorsing checks payable to the corporation and depositing those checks into her personal bank account and into her children's bank accounts, all at the defendant bank. *Id.*

After the embezzlement was discovered, the corporation filed a lawsuit against the bank based on common law negligence and conversion under the UCC, Section 47-3-420. The corporation argued in effect that the bank was liable to the corporation because it failed to refuse the secretary/treasurer's deposits and failed to alert the corporation to her activities. *Id.* at 278-79. After a bench trial, the trial court held in favor of the bank on both the conversion and the negligence claims. The corporation appealed. *Id.* at 271. On appeal, the appellate court noted that the UCC effectively displaced the common-law claim of negligence. It stated that the corporation's claims against the bank fell "squarely within the scope of Articles 3 and 4," because "[a]rticles 3 and 4 of the UCC embody a delicately balanced statutory scheme governing the endorsement, negotiation, collection, and payment of checks. They provide discrete loss-allocation rules uniquely applicable to banks." *Id.* at 281. Thus, the court held, the corporation's "claims against the bank and the scope of the remedies available to [the corporation] are governed solely by the UCC." *Id.* at 281-82. The Court also held that the evidence at trial was sufficient to establish all of the elements of the UCC conversion claim. *Id.* at 285. It determined that the defendant bank was not a holder in due course of the checks made payable to the corporation and endorsed by the secretary/treasurer. *Id.*

---

[21] We assume that this evidence is not undisputed, but presume it to be true for purposes of the Bank's summary judgment motion.

Thus, as in *C-Wood Lumber Co.*, we find that the transactions at issue fall within the ambit of UCC provisions Section 47-3-307 and 47-3-420, and some evidence in the record indicates that the Bank is not a holder in due course of the checks at issue. We note that the Court's analysis in *C-Wood Lumber Co.* did not end with the conclusion that the bank was not a holder in due course; we address the remainder of its analysis *infra* in this Opinion.

The Bank rightly points out that *C-Wood Lumber Co.* is distinguishable from the case at bar because it did not involve the use of a power of attorney. The Bank sees this as a crucial distinction, arguing in effect that Section 45-2-707(d) creates a safe harbor for the Bank if the transaction involved a power of attorney. Section 45-2-707(d) is contained in Title 45 (Banks and Financial Institutions), Chapter 2, Part 7, which generally relates to deposits in banks. *See* T.C.A. § 45-2-701, *et seq*. The statute provides:

> (a) A bank . . . may recognize the authority of a power of attorney authorizing in writing an attorney-in-fact to operate . . . the account of a depositor . . . .
> . . .
>
> (d) No bank shall be liable for damages, penalty or tax by reason of any payment made or property withdrawn pursuant to this section.

T.C.A. § 45-2-707 (2007). Thus, this statute provides that, under the circumstances noted in the statute, a bank cannot be held liable for the actions of an attorney-in-fact if the bank acted in reliance on "the authority of a power of attorney authorizing in writing an attorney-in-fact to operate . . . the account of a depositor." *Id.*; *see Rogers v. The First Nat'l Bank*, No. M2004-02414-COA-R3-CV, 2006 WL 344759, at *7, *11 (Tenn. Ct. App. Feb. 14, 2006).

The Bank contends that it eschews liability under the UCC if Section 45-2-707(d) applies. It emphasizes the broad language in the statute, and insists that it is directly applicable to the facts in this case. In support, the Bank cites this Court's decision in *Rogers v. The First National Bank*, No. M2004-02414-COA-R3-CV, 2006 WL 344759 (Tenn. Ct. App. Feb. 14, 2006).

In *Rogers*, an elderly man executed a power of attorney appointing his daughter as his attorney-in-fact. The power of attorney authorized the daughter to "sign checks on [the father's] accounts, withdraw funds from [the father's] account, make deposits, sell stocks, bonds or other securities, sell my personal property or real estate and collect any money due me." *Rogers*, 2006 WL 344759, at *1. Utilizing the power of attorney, the daughter withdrew large sums of money from her father's bank account and used the money for her

own purposes. The father, through his court-appointed guardian, sued the bank for damages.[22] The bank argued that it was immune from suit based on its reliance on the daughter's power of attorney pursuant to Section 45-2-707(d).[23] The appellate court agreed and held that, "[b]ecause the Bank relied on the duly executed power of attorney in permitting [the daughter] to withdraw the funds held in [the Father's] accounts at the Bank, it cannot be held liable as a matter of law." *Id.* at *11.

While ***Rogers*** reinforces the Bank's argument that Section 45-2-707(d) is to be given full force and effect, it tells us little else. ***Rogers*** did not appear to involve claims that the daughter endorsed checks made payable to her father and deposited them at the defendant bank, and thus did not involve transactions that would have been governed by the UCC provisions at issue here. Thus, ***Rogers*** simply does not inform our decision regarding whether Section 45-2-707(d) shields the Bank from liability for claims brought pursuant to the UCC.

The Plaintiff argues that the immunity granted in Section 45-2-707(d) applies only to actions of a fiduciary with respect to "payments made" or "property withdrawn" from the account of the principal, and it does not apply to other actions by a fiduciary. This interpretation, she argues, is supported by the fact that the provisions of the UCC quoted above were specifically designed to provide a cause of action against a bank for assisting a fiduciary in this way, and the statute did not make a provision for any type of immunity for banks. The Plaintiff points out that the UCC and Sections 47-3-307 and 47-3-420 were enacted in 1995, well after the enactment of Section 45-2-707, and that the legislature had knowledge of the immunity statute when it enacted the UCC. Thus, by the Plaintiff's interpretation, because her claims are based on the Bank's conduct with respect to the third-party checks, not with respect to "payments made" or "property withdrawn" from Mr. West's account, the Bank is not entitled to immunity for its reliance on the POA under Section 45-2-707(d).

In response, the Bank argues that the language in Section 45-2-707(d) is intentionally broad, and cites this Court's decision in ***Rogers.*** As we have indicated, however, ***Rogers*** is unhelpful, because it did not involve a third party check payable to the beneficiary. While the

___

[22]The theory of recovery asserted by the plaintiff in ***Rogers*** is not clear from the appellate decision. It appears that the theory or theories asserted were based in the common law, not on the UCC or any other statutes. *See Rogers*, 2006 WL 344759, at *3, *7.

[23]The plaintiff in ***Rogers*** argued that Section 45-2-707(d) did not apply, because the defendant bank had drafted the power of attorney for the daughter and, in doing so, entered into its own fiduciary relationship with the father. ***Rogers***, 2006 WL 344759, at *7. The appellate court rejected this argument and determined that the bank had no independent fiduciary responsibility to the father. Whether the Bank in this case had a fiduciary duty to the Plaintiff is not at issue in this appeal.

Bank cites similar statutes in other jurisdictions,[24] it cites no cases delineating the breadth of the statutes, and we have found none.[25]

Examining closely the language in Section 45-2-707, we note that subsection (d) clearly refers back to the preceding subsections, stating that a bank is not liable for damages "by reason of any payment made or property withdrawn *pursuant to this section*." T.C.A. § 45-2-707(d) (emphasis added). The language in subsection (d) parallels the language in subsection (a), which refers to a power of attorney that authorizes an attorney-in-fact "to operate . . . the account of a depositor, or to access a customer's safe deposit box." The Bank argues that Section 45-2-707 should be interpreted so that a power of attorney operates as a talisman of sorts, to insulate the Bank from liability in any transaction that involves a power of attorney. We decline to do so. Given the blanket prohibition in the statute against holding a bank liable, we think it is incumbent upon us to limit the statute to its terms, that is, to transactions that involve a "payment made or property withdrawn" in connection with an attorney-in-fact's "operat[ion of] . . . the account of a depositor, or . . . access [to] a customer's safe deposit box." Because the transactions at issue in this appeal involve neither, we find that Section 45-2-707 is inapplicable to the facts before us.[26] Therefore, we must respectfully disagree with the trial court's conclusion that the Bank is entitled to summary judgment based on Section 45-2-707.

---

[24] CAL. FIN. CODE § 6725; CONN. GEN. STAT. § 1-56b; GA. CODE ANN. § 7-1-352; IND. CODE. ANN. § 28-9-302; IOWA CODE. ANN. § 534.02; KY. REV. STAT. ANN. § 286.5-421; LA. REV. STAT. ANN. § 6:922; MISS. CODE. ANN. § 81-12-133; N.H. REV. STAT. ANN. § 384.39; N.J. STAT. ANN. § 17:12B-87; N.M. STAT. ANN. § 58-10-60; ORG. REV. STAT. § 708A.440; S.C. CODE ANN. § 34-28-630; TENN. CODE ANN. § 45-2-707.

[25] In a case out of North Dakota, a trustee of a living trust, who was also given power of attorney to manage the bank accounts of the trust, converted funds from the trust for his own personal use. The successor trustees sued the bank for conversion under the same provisions of the UCC involved here. *Alerus Fin., N.A. v. W. State Bank*, 750 N.W.2d 412, 428 (N.D. 2008). The bank argued that it could not be held liable because the trustee/attorney-in-fact was authorized to make the transactions pursuant to the power of attorney. Ultimately, the court remanded the case for other reasons, specifically refraining from addressing any defenses the bank may have had, either under the UCC or otherwise. *Id.* at 429.

[26] In the alternative, the Bank's interpretation of Section 45-2-707, as an absolute bar to liability in any transaction involving a power of attorney, puts it squarely at odds with the "automatic liability" of a bank under the circumstances set forth in Section 47-3-307. MARION BARFIELD, JR. AND PETER ALCES, *Bank Liability for Fiduciary Fraud*, 42 475, 520 (Winter 1991). Under those circumstances, the two statutes cannot peaceably coexist. In *C-Wood Lumber Co.*, the appellate court found that the Uniform Fiduciaries Act was implicitly repealed by the legislature's enactment of Section 47-3-307. *C-Wood Lumber Co.*, 233 S.W.3d at 278. If Section 45-2-707 were interpreted as broadly as the Bank suggests, we would be forced to conclude that it was likewise implicitly repealed insofar as it conflicts with the clear terms of the UCC. However, as noted above, under the widely accepted principles of statutory construction, we seek to avoid an interpretation that "places one statute in conflict with another." *Cronin*, 906 S.W.2d at 912.

Our conclusion that Section 45-2-707 does not apply in this case does not mean that the POA has no legal significance. In *C-Wood Lumber Co.*, after finding that the bank was not a holder in due course of the checks at issue, the Court went on to examine the terms of the fiduciary's authority in the corporate resolution to determine if they provided the defendant bank with "a defense against C-Wood's conversion claim." *C-Wood Lumber Co.*, 233 S.W.3d at 288. It noted that a signature card and a corporate resolution "create[] a contractual relationship between a bank and its corporate customer." *Id.* at 286. The Court recognized that the UCC "allows banks and their customer to use agreements such as corporate resolutions to vary the terms imposed by the [UCC]," adding, "We see no reason why a bank should not be allowed [to] rely upon the terms of a properly enacted corporate resolution when the bank is presented with bearer paper signed by an authorized corporate officer." *Id.* at 287 n.63 (citing T.C.A. § 47-4-103(a)).[27]

Examining the terms of the corporate resolution, the *C-Wood Lumber Co.* Court observed that it authorized the secretary-treasurer "to deposit checks payable to C-Wood into her personal accounts." *Id.* at 287. Thus, as to the checks deposited into the secretary/treasurer's personal bank account, the court held that the bank was acting in good faith and in a commercially reasonable manner, and so the corporation, not the bank, had to bear the loss from the fiduciary's embezzlement. *Id.* at 287. In contrast, the corporate resolution did not authorize the secretary/treasurer to deposit corporate funds into her children's bank accounts. *Id.* at 287-88. Consequently, the court held that the corporate resolution did not provide the bank with a defense to the conversion claim on the funds deposited into the children's accounts. *Id.* at 288.

In the instant case, we recognize that the scope of the POA signed by Mr. West was exceedingly broad. Among other things, the POA authorized Nephew to "sign [Mr. West's] name as a drawer of checks and drafts thereon, and to endorse checks, drafts or other

---

[27]The *C-Wood Lumber Co.* Court explained:

> When a depository bank receives checks such [as] the ones involved in this case, most courts have been quick to conclude that the bank is not acting in a commercially reasonable manner if it does not first ascertain the depositor's authority to make such a deposit. One of the ways that a bank can discharge its responsibility is to consult the signature cards and corporate resolutions associated with the depositor and the payee. A bank acts in good faith and in a commercially reasonable manner when it accepts a deposit in accordance with an otherwise valid corporate resolution. Thus, a broadly worded corporate resolution authorizing a bank to allow a corporate officer to endorse checks payable to the corporation and deposit them into the officer's personal account will shield the depository bank from liability under Tenn. Code. Ann. § 47-3-420.

*C-Wood Lumber Co.*, 233 S.W.3d at 286 (citations and footnotes omitted).

instruments belonging to [Mr. West] or in which [Mr. West has] any right, title or interest *for any purpose whatever*, whether for deposit *or for any other purpose*." (Emphasis added). Thus, the POA appears to give Nephew the authority to endorse checks belonging to Mr. West for "any purpose whatever," including his own personal use.

We decline to address in this appeal whether the POA affords the Bank a defense to the Plaintiff's claims of conversion. The breadth of Nephew's POA was not the basis for the Bank's argument in its summary judgment motion, and it was not the basis for the trial court's decision; both relied squarely on Section 45-2-707. Moreover, it is unclear from the record at this point whether the POA created "a contractual relationship" that varied the terms of the UCC, as did the corporate resolution in the *C-Wood Lumber Co.* case. We note as well that some courts in other states, applying the UCC provisions at issue here, have drawn a sharp distinction between the fiduciary's authority and his breach of his fiduciary duties. *See, e.g., Alerus Fin., N.A. v. W. State Bank*, 750 N.W.2d 4123, 427 (N.D. 2008) (the fact that a fiduciary "was authorized does not mean he did not breach his fiduciary duties").

For the reasons outlined above, we must respectfully disagree with the trial court's conclusion that Section 45-2-707 shields the Bank from liability in this case. Consequently, we must also conclude that the grant of summary judgment to the Bank on this basis was in error. The Bank's defenses to the Plaintiff's conversion claim, including any defense that it acted in a commercially reasonable manner, may be addressed on remand.

## CONCLUSION

The decision of the trial court is reversed. The cause is remanded for further proceedings consistent with this Opinion. Costs on appeal are to be taxed to Appellee Regions Bank, for which execution may issue, if necessary.

_____

HOLLY M. KIRBY, JUDGE
